# CULLIFORD *v.* GOMILA.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE
EASTERN DISTRICT OF LOUISIANA.

No. 33. Argued October 18, 19, 1888.—Decided October 29, 1888.

A charter-party, containing a guaranty by the owner of the vessel that
she should carry not less than 10,000 quarters of grain, of 480 pounds,
held to have been complied with by the owner of the vessel.

The charter-party not having contained any cancelling clause, or any pro-
vision as to any time for beginning or completing the lading, or shipping
the grain, the charterer could not have, in a suit against the owner of
the vessel for a breach of the charter-party, the benefit of any clause
limiting the time of the shipment of the grain, contained in a prior con-
tract for its sale, made by the charterer, where such contract had been
made known to the owner of the vessel before the charter-party was
signed.

The vessel having been loaded with less than 10,000 quarters, and appear-
ing to be full, as she was then stowed, the parties negotiated for a set-
tlement, but before any was concluded, the owner of the vessel notified
the charterer that the stowage would be rearranged so that the vessel
would on the next day be ready to take the full 10,000 quarters. The
charterer on the latter day sold the cargo at auction, on board, with privi-
lege of the charter. The vessel afterwards took on board enough more
grain to make the full 10,000 quarters and delivered it under a charter for
the same voyage, made with the vendee named in the contract of sale of
the grain made by the first charterer: *Held*, that the owner of the vessel
was not liable to the first charterer for any losses sustained by him by the
failure of such vendee to pay for the grain under such contract of sale.

The charter-party with the first charterer was complied with by the owner
of the vessel in a reasonable time.

THIS was a libel in admiralty, *in personam*, filed in the Dis-
trict Court of the United States for the Eastern District of
Louisiana, on the 9th of July, 1883, by A. J. Gomila and
Learned Torrey, composing the firm of Gomila & Co., against
J. H. W. Culliford and John S. Clark, composing the firm
of Culliford & Clark, as owners of the steamship Deronda, a
British vessel, to recover damages for the alleged breach of a

charter-party entered into at New Orleans on the 19th of June, 1883, chartering that vessel to Gomila & Co. The material parts of the charter-party were as follows:—

"It is this day mutually agreed between De Wolf & Hammond, as agents of the steamship Deronda, of 1090 tons net register or thereabouts, now in New Orleans, and Mess. Gomila & Co., of New Orleans, merchants, that the said steamer shall, with all convenient speed, proceed to New Orleans, or so near thereto as she may safely get, and there, being in hull, boilers and machinery tight, staunch and strong, classed 100 A 1, and every way fitted for the voyage, shall load as customary at such safe loading berth, always afloat, as ordered by charterers on arrival, (and, if afterwards required by them to shift, they to pay the ordinary expense of towing) a full and complete cargo of wheat $\frac{and}{or}$ maize $\frac{and}{or}$ rye in bulk $\frac{and}{or}$ ship's sacks, as customary, which is to be brought to and taken from alongside as customary, at merchants' risk and expense, at ports of loading and discharge, (all lighterage required to be paid for by cargo,) and at charterers' risk, not exceeding what she can reasonably carry over and above her tackle, apparel, fuel, provisions, and furniture, and, being so loaded, shall therewith proceed under steam to a safe port, always afloat, in the United Kingdom or on the Continent, between Bordeaux and Hamburg, both inclusive, excluding Rouen, calling at Queenstown or Falmouth for orders, which are to be given within twelve hours of arrival or lay days to count, or so near thereunto as she may safely get, one port only to be used, and deliver the same on being paid freight, all in British sterling, as follows: Five shillings and three pence sterling per quarter of 480 pounds weight, delivered in full, if calling at Queenstown or Falmouth or ordered direct to Continent. If ordered to Continent from port of call, ten per cent additional. If ordered to United Kingdom direct, three pence off. Charterers have option of Elsinore for orders to discharge at Copenhagen or Aarhuns, at five shillings and nine pence per quarter of 480 lbs. Steamer is guaranteed to carry not less than ten thousand quarters of 480 lbs.

\*     \*     \*     \*     \*

"4. Stevedore for loading said steamer to be appointed by charterers, under captain's directions, at current rates for such labor.  Charterers are not to be held responsible for improper stowage.

"5. Steamer to have liberty to call at any ports for coal or other supplies.

\*     \*     \*     \*     \*

"13. Sixteen running days, Sundays excepted, are to be allowed the said merchants (if the steamer is not sooner dispatched) for loading and discharging, and ten days on demurrage, over and above the said lay days, at six pence sterling per gross register ton per day.

"14. Should the steamer not be ready to load at New Orleans on or before the —————, charterers or their agents have the option of cancelling this charter.

"15. Lay days to commence the day after the steamer is declared ready to receive cargo, and having been passed by the surveyor of grain vessels, and written notice given by the master to the charterers or their agents.

\*     \*     \*     \*     \*

"19. Penalty for non-performance of this agreement, estimated amount of freight."

The charter-party was signed by De Wolf & Hammond, as agents of the vessel, and by Gomila & Co.

The libel alleged, that, on the 28th of June, 1883, the libellants provided and furnished a cargo of 10,000 quarters, of 480 pounds each, of corn, to the vessel, for her voyage; that the loading was then commenced and proceeded with until June 30th, 1883, when all further loading of cargo was stopped by official order of the marine inspector of the port, who was present at the time, and who pronounced the vessel full all over, as in fact and truth it was; that, when the loading was so stopped, and the vessel declared to have a full and complete cargo, only $82,588\frac{2}{56}$ bushels, the equivalent of $9635\frac{130}{480}$ quarters, of 480 pounds each, had been loaded on the vessel, and it was in fact impossible to properly stow in her any greater quantity, and she was entirely unable to carry

the 10,000 quarters, of 480 pounds each; that the respondents wholly failed to comply with the said guarantee; that, in consequence thereof, the libellants were prevented from fulfilling their contract of sale of the 10,000 quarters of corn of 480 pounds each, with special reference to which they had entered into the charter-party; that, afterwards, the libellants, in order to save loss as far as possible, offered the cargo, which was so loaded on the vessel, to the respondents, at the price at which the libellants had sold it, which offer was refused by the respondents; that, all other negotiations for a settlement failing, the libellants were obliged to have the cargo sold, for account of whom it might concern, which was done, at public auction, on the 7th of July, 1883, after notice to the respondents, through De Wolf & Hammond, and advertisement in the newspapers of New Orleans, that being in the opinion of the libellants for the best interests of all parties concerned; that the libellants had performed all their undertakings in the charter-party, but the respondents, and their agents, and the master of the vessel, had not performed the undertakings of the respondents contained in the charter-party; and that the libellants had thereby sustained damages to the amount of more than $24,559.70.

The vessel was attached on process, and the respondents appeared and answered the libel. The answer set up, that, shortly after the charter-party was signed, and before any cargo was offered to the vessel, the libellants informed De Wolf & Hammond that their interests and obligations in the charter-party had been transferred to Messrs. E. Forestier & Co.; that the charter-party was delivered back to the agents of the respondents by E. Forestier & Co., and, with the agreement of all parties, was cancelled, and a new charter-party for the vessel was entered into with E. Forestier & Co., as charterers; that the vessel was loaded under such new charter-party, which, in all of its conditions, had been performed on the part of the vessel, that the vessel carried and delivered the 10,000 quarters of grain, according to the guarantee contained in the charter-party with E. Forestier & Co.; and that the libellants had sustained no loss by any act of the respondents. There

was also a denial of the allegations of the libel that the libellants had performed all the undertakings on their part, in the charter-party with them.

The case was tried in the District Court, on proofs taken on both sides, and on the 2d of June 1884, that court entered a decree in favor of the libellants for $9360.97, with 5 per cent interest from June 30th, 1883, until paid, and costs of suit, against the respondents and against Thomas D. Miller and Emile L. Carrière, as sureties in the bond releasing the vessel from attachment. The decision of the District Court is reported as *Gomila* v. *Culliford*, 20 Fed. Rep. 734. The respondents and their sureties, and also the libellants, appealed from that decree to the Circuit Court. Further proofs were taken in the Circuit Court and that court, on the 28th of February, 1885, filed its findings of fact and conclusions of law, and rendered a decree in favor of the libellants, against the respondents, and against Miller and Carrière, as such sureties, for $23,993.76 damages, with 5 per cent interest from June 30th, 1883, until paid, and costs of suit.

The material findings of fact by the Circuit Court were as follows:

"First. On the seventh day of June, 1883, Gomila & Co., who were large grain dealers in the port of New Orleans, entered into the following grain contract:

"'Bought from Gomila & Co., by Messrs. E. Forestier & Co., at the price of (60 cts.) sixty cents per bushel of 56 lbs., on board seller's vessel, with freight at (6s.) six shillings per quarter, and to be shipped from New Orleans during the month of June, not later than the 30th (midnight), (seller's option), a cargo of not over 12,000 and not under 10,000 quarters (480 lbs.) of No. 2 mixed corn of the standard of New Orleans inspection. Destination: Elsinore, for orders to Copenhagen or Aarhuns. Any difference in freight for account of seller; cash on delivery of documents.

"'New Orleans, June 7th, 1883.

"'GOMILA & CO.'

" A similar copy was made at the same time, signed ' E. Forestier & Co.'

" Second. June 18th, 1883, the steamship Deronda, of which J. H. Culliford was the sole owner, though Culliford & Clark, claimants, were the apparent owners and agents in England, and of which De Wolf & Hammond were the New Orleans agents, arrived in the port of New Orleans with a cargo of salt and fruit. Her agents in New Orleans, Messrs. De Wolf & Hammond, and Gomila & Co., had opened negotiations for a charter on the 16th of June. Gomila & Co., having the contract aforesaid with Forestier & Co., insisted on owner's guarantee that the Deronda would carry 10,000 quarters of 480 lbs., whereupon the following cable dispatch was sent to Hammond, of De Wolf & Hammond, who was then in Europe and in communication with the claimants:

" 'June 16th.

" ' To W. J. Hammond, Liverpool:

" ' Deronda. Are offered 5–6, Copenhagen, Aarhuns, calling at Elsinore for orders. She must be guaranteed to carry not less than 10,000 quarters; charterers to have power of cancelling charter-party if vessel is not ready to load cargo by 25th of June.'

" To which dispatch the following reply was sent:

" 'June 18th.

" ' Fix Deronda, 5–6, Aarhuns; guarantee 10,000 quarters provided captain agrees quantity; lighterage at charterers' risk and expense. Try 5–9.

" ' W. J. Hammond.'

" Third. On the 18th De Wolf, agent, and the master called on Gomila & Co., and consulted as to whether the Deronda could carry 10,000 quarters of corn, the question relating more to space than to weight. At this consultation calculations were made by Mr. Gomila, of the firm of Gomila & Co., and the master, as to the cargo space of the steamer, from her general plan, and her ability to carry 10,000 quarters of corn, both

reaching the conclusion that 'the steamer would be able to carry 10,000 quarters, and Gomila advised the master to so cable owners. A cable message was then made up by the master and De Wolf from Gomila's code-book, in which the master said, 'the vessel will carry 10,000 quarters of grain, if we coal at Halifax.' After the said message was prepared, Gomila gave, as his reasons for insisting on a guarantee, the aforesaid contract with Forestier & Co., which was produced and read, and Gomila stated that he had no use for any vessel that would not carry 10,000 quarters of grain; that he must have a guarantee, and feared that if the vessel would not carry that amount the consequences would be serious; that the market had declined and was still declining, and the loss would be very heavy, because the buyer would have the right to reject the cargo if the conditions were not strictly fulfilled.

" The same day the following cable message was sent by ship's agents :

" ' JUNE 18TH.

" ' To W. J. Hammond, Liverpool:

" ' Deronda. Captain's opinion she can carry 10,000 quarters, coaling Sydney ; have closed, subject to owners' approval, 5–9, calling at Elsinore for orders Copenhagen, Aarhuns, charterer's option ; Cork or Falmouth for orders, 5–3, to discharge at a safe port in U. K. or Continent Bordeaux to Hamburg. If ordered to U. K. direct, 3*d.* off. If ordered to Continent from port of call, 10 per cent additional.

" ' DE WOLF & HAMMOND.'

" To which message, on June 19th, De Wolf & Hammond received the following answer :

" ' JUNE 19TH.

" ' Fix Deronda. After hard work got Culliford, owner, accept your offer, but must exclude Rouen ; cannot go there.

" ' W. J. HAMMOND.'

" Fourth. On June 19th the charter-party was entered into, of which a true copy is attached to the libel, except the en-

dorsement in red ink across the face, and is made part of this finding.

"Fifth. The cancelling date of said charter-party was not fixed because Gomila & Co. waived it, as the ship was in port and they had confidence in the ability and willingness of the master to get the ship ready in time.

"Sixth. On the 28th of June the ship was ready to receive cargo and the loading then commenced. No formal tender appears to have been made of the ship on that day, but the loading was commenced with the consent of all concerned. The loading was continued, with slight interruptions from rain, and until twenty minutes past three o'clock in the afternoon of the 30th of June, when the loading was stopped, and the ship was declared by the underwriters' inspector to be full all over and ready to proceed on her voyage, and the inspector gave his certificate to that effect. She then had only 9635 quarters on board, equivalent to $82,588\frac{2}{56}$ bushels, and could take no more with safety, as she was then loaded and stowed, although libellants had the balance of the cargo of 10,000 quarters in barges alongside, and it could have been put on board before midnight if the ship could have taken it.

"Seventh. After the loading had begun and before it was known whether the Deronda could take the guaranteed quantity, all parties supposing that she could, Gomila & Co., as is usual in such cases, handed their copy of the charter-party to Forestier & Co. The latter, without authority from the charterers, took the copy to the ship's agent unindorsed, and obtained a charter in their own name, but otherwise the same in all respects as charter to Gomila & Co., for the purpose, as they explained, of appearing to their correspondents as original parties. Gomila & Co. were advised of this by De Wolf, of De Wolf & Hammond, before the loading was finished, on June 30th, but replied to him that they would not object to such a change if the vessel fulfilled the guarantee in the charter, but that if she failed they would expect the return of the papers. On this point the court finds that Gomila & Co. did not authorize the surrender of their charter and the giving of a new one to Forestier & Co. save upon the condition that the Deronda should first execute her guarantee.

"Eighth. When, on the 30th of June, the steamer was loaded, as described in the sixth finding, all parties had notice at once that the steamer could not carry the quantity guaranteed; whereupon Gomila, who was about to depart for St. Louis, left the matter in the hands of Bangston, of Forestier & Co., to arrange, instructing him substantially as follows:

"'I have no doubt this matter can be arranged with the owners, and anything you do to protect me I will be satisfied with. It seems to me the best way to arrange the matter would be to telegraph to the owners, that if they will take the cargo off our hands at twenty-eight one and one-half pence, as agreed upon, no one will be injured and I will be satisfied; but in case they do not do this, then all that I ask is to be made whole in my contract, and you can make negotiations to that effect.'

"Forestier & Co. cabled their correspondents as follows:

"'Deronda. We have shipped 9600 quarters; reply if in order or not. What do you propose? Cable at once;' and received answer, July 2d, to refuse Deronda; and De Wolf & Hammond cabled claimants as follows:

"'June 30th.
"'To Culliford & Clark, Sunderland:
"'Deronda loaded; carries 9635 quarters; cargo sold not less than 10,000 quarters. Copenhagen, 28–3; present value, 25; buyers refuse acceptance, as cargo falls short. Charterers hold ship responsible. Advise.

"'De Wolf & Hammond.'

"To this last dispatch the following was sent:

"'July 1st.
"'Complete swindle. Captain knows ship discharged 10,380 Bordeaux. Compromise; pay value grain.

"'Culliford & Clark.'

"'July 3d.
"'To Culliford & Clark, Sunderland:
"'Cargo on board, 2065 tons maize, 170 tons coal; surveyors refuse load deeper: ship full all over; no advantage New-

port; cargo sold, June loading; shippers can sell Copenhagen, 25s., you paying difference, or owners buy cargo 28.3 cif.; best can do. Which do you advise? Cargo maize, No. 2 mixed, sail grade, very good. May we draw on you for same?

"'DE WOLF & HAMMOND.'

" To which the following answer was made:

"'JULY 4.

"'Consult indemnity lawyer, McConnell. If he approves, dispatch Deronda; give bail, if necessary. First telegram simply means paying difference value alleged short shipment; save delay.

"'CULLIFORD & CLARK.'

"It does not appear that charterers at the time had any knowledge of these dispatches.

"Ninth. Negotiations were opened and continued between the parties with a view to compromise, but without result until July 5th, on which day Forestier & Co. notified Gomila & Co. that they refused the cargo because it was short and their buyers in Copenhagen had declined to accept it. They claimed damages of Gomila & Co. for violation of the contract of sale, consisting in the loss of their commissions, amounting to $3194.39, which Gomila & Co. paid.

"Tenth. From July 3d to July 5th Gomila & Co. telegraphed to some of the best known dealers in England and France for quotations and offers. The best offer was twenty-three shillings, ordinary terms or twenty-four shillings, rye terms (shippers guarantee sound condition on arrival). Libellants then decided to sell the cargo on board, at the shipper's risk in the port of New Orleans, with the privilege of the charter, and so notified Messrs. De Wolf & Hammond, at the same time giving the owners the option of taking the cargo at the price at which it had been sold to Forestier & Co.

"Eleventh. On the sixth day of July the ship's agents notified Gomila & Co. that they would take out coal and make room for the balance of the cargo, and that the ship would be made ready by the 7th. Gomila & Co. refused this proposal.

In the meantime Gomila & Co. had given notice, in the daily papers published in New Orleans, that the cargo would be sold at public auction, to the highest bidder, for cash, on July 7th, by one of the licensed auctioneers of the city. Against this proposed sale the agents made public protest on the part of the steamer, both on July 6th and 7th. The sale, however, took place as advertised, and the 9635 quarters then on board were sold for $29,622.84 to A. Carrière & Sons, with privilege of the charter. A. Carrière & Sons afterwards sold the cargo, with privilege of charter, to J. B. Camors & Co., and the latter in turn resold to Forestier & Co. for the sum of $40,422.00. The charter to Gomila & Co. having been destroyed by De Wolf, they made protest for substitute, and then for want of such charter used copy of one issued to Forestier & Co. to make title.

"Twelfth. On July 13th, the stowage of the Deronda having been in the meantime rearranged, and a large quantity of coal and water, the latter from the ballast tanks, having been taken out, the Deronda was again tendered to both Gomila & Co. and to Forestier & Co., demanding balance of cargo. This was furnished by J. B. Camors & Co., and enough more grain was taken aboard to make over 10,000 quarters, with which the ship sailed, on the 18th of July, for her original destination, and there safely arrived and delivered cargo under the substitute for charter-party provided as explained in finding 11.

\*     \*     \*     \*     \*

"Fourteenth. The carrying capacity of the Deronda for grain on voyages from New Orleans to Europe, when properly fitted out, was over 10,000 quarters, and she had, on a previous voyage, with 224 tons of coal in her bunkers, safely carried a cargo of 10,253 quarters of grain, but as she was fitted out and prepared and tendered, in the manner hereinbefore found, to Gomila & Co., on June 28th, 1883, she could not with safety, under maritime and underwriters' rules, carry 'cargo of 10,000 quarters, and she failed to receive such cargo, as hereinbefore found. By this failure the libellants lost the advantage of their said sale to Forestier & Co.

"Fifteenth. Corn is a perishable article in shipping, both as to time and transit, and is always at risk in voyages across the ocean, particularly if it remains in the port of New Orleans under the heat of a July sun beating on the decks, in which case the risk is increased every day it remains in port.

"Sixteenth. The sale of the cargo at public auction was fairly conducted, and, under the circumstances, was necessary and proper for the protection of the rights of all parties.

"Seventeenth. By the inability and failure of the steamer to receive, when first tendered to Gomila & Co., a cargo of 10,000 quarters, they suffered loss as follows:

"1st. Amount of commission paid Forestier & Co. $3,194 29
"2d. Loss on 9635 quarters (82,588$\frac{2}{56}$ bushels) of corn, being the difference between the price of the sale to Forestier & Co. and the sale at auction to Carrière & Sons............ 20,549 39
"3d. Loss on 365 quarters (3126 bushels)........ 250 08

"Making a total loss to Gomila & Co., by the failure aforesaid, of twenty-three thousand nine hundred and ninety-three and $\frac{76}{100}$ dollars............................................ $23,993 76."

The indorsement in red ink across the face of the charter-party, referred to in the fourth finding of fact, was in these words:

"JUNE 29, 1883.

"This charter-party has been cancelled, and, at the request of A. J. Gomila, of Gomila & Co., similar charter-parties made out to E. Forestier & Co., and the copies of said charter-party previously given to Mess. Gomila & Co. have been returned to us by E. Forestier & Co. and destroyed.

"DE WOLF & HAMMOND."

On the foregoing facts the Circuit Court found as follows, as conclusions of law:

"1st. That, under said charter-party, the defendants were bound under their guarantee, to see that, when the Deronda was

tendered to the libellants for loading, she was fitted, prepared, and arranged so as to be able to carry not less than 10,000 quarters of grain, under underwriters' and maritime regulations.

"2d. That the said defendants were charged with full notice, in law, of the special objects and purposes of libellants in effecting said charter, and, therefore, are liable to the said libellants for the amount of damages suffered by the latter from inability to sell and deliver under the grain contract with Forestier & Co.

"3d. That the amount of such damages was the sum of $23,993.76.

"4th. That libellants should have judgment for that amount, with legal interest from June 30th, 1883, against the defendants, and against the sureties on the release bond in attachment."

From the decree of the Circuit Court the respondents and the sureties appealed to this court.

*Mr. J. R. Beckwith* for appellant. *Mr. J. McConnell* also filed a brief for the same.

*Mr. J. D. Rouse* for appellees. *Mr. William Grant* and *Mr. J. Ward Gurley, Jr.*, were with him on the brief.

I. The suit was properly brought against the firm of Culliford & Clark. Besides the fact that they held themselves out and dealt with the libellants in relation to the Deronda as owners thereof, they admit in their answer the execution of the charter-party sued on, and aver novation and performance of the new contract. The plea is one of confession and avoidance, which estops them from denying the matter confessed. Like the plea of payment it excludes all other defences. *Atkins* v. *The Disintegrating Co.*, 18 Wall. 272; *Manro* v. *Almeida*, 10 Wheat. 473.

II. Out of an express contract an implied one often arises. In this case out of the express contract of the charter-party there arose the implied one that the ship, when tendered,

would be able to receive the cargo as guaranteed. *Work* v. *Leathers*, 97 U. S. 379; *Ye Seng Co.* v. *Corbitt*, 7 Sawyer, 368; *Stanton* v. *Richardson*, L. R. 7 C. P. 421; *Lyons* v. *Wells*, 5 East, 428; *Havelock* v. *Geddes*, 10 East, 555; *Tarrabochia* v. *Hickey*, 1 H. & N. 183.

III. Because there was no cancelling date fixed in the charter-party, respondents had not their own option as to the time when they would tender compliance with their contract, but were required to do so within a reasonable time under the circumstances. *Jaques* v. *Millar*, 6 Ch. D. 153; *Doe* v. *Benjamin*, 9 A,d. & El. 644; *Dawson* v. *Duplantier*, 15 La. 289; *Cable* v. *Leeds*, 6 La. Ann. 293; *Gould* v. *Banks*, 8 Wend. 562; *S. C.* 24 Am. Dec. 90.

IV. The general rule is, that the party injured by a breach of contract is entitled to recover all his damages, including gains prevented, as well as losses sustained, provided they are certain and such as might be expected to follow the breach, if the special circumstances under which the contract is made are communicated and made known to both parties. *Messmore* v. *N. Y. Shot and Lead Co.*, 40 N. Y. 422. *Griffin* v. *Colver*, 16 N. Y. 489; *S. C.* 69 Am. Dec. 718; *Booth* v. *Spuyten Duyvil Rolling Mill Co.*. 60 N. Y. 487; 13 Moak's Eng. Rep. 52, n. (collecting all the authorities); 22 Moak's Eng. Rep. 734, n.; *Deming* v. *Railroad*, 48 N. H. 455 (where the leading authorities are reviewed); *Hadley* v. *Baxendale*, 9 Exch. 341; *Ye Seng Co.* v. *Corbitt*, 7 Sawyer, 368. The law of Louisiana, as well as the common law, recognizes this rule in awarding damages. Civil Code, Art. 1934. See, also, *Goodloe* v. *Rogers*, 10 La. Ann. 631; *Lobdell* v. *Parker*, 3 La. 328; *Rugely* v. *Goodloe*, 7 La. Ann. 294.

In the construction of contracts, courts look not only to the language employed, but to the subject-matter and the surrounding circumstances. *Merriam* v. *United States*, 107 U. S. 441; *Merchants' Ins. Co.* v. *Allen*, 121 U. S. 67.

V. For the measure of damages for breach of a contract to sell, see *Engell* v. *Fitch*, L. R. 4 Q. B. 659; L. R. 3 Q. B. 314; explaining *Flureau* v. *Thornhill*, 2 W. Bl. 1078, and approving the general rule laid down in *Robinson* v. *Harmon*, 1

Exch. 850, that when a party sustains a loss by reason of a breach of contract he is, so far as money can do it, to be placed in the same situation with respect to damages as if the contract had been performed. *Bain* v. *Fathergill*, L. R. 6 Ex. 59 ; 2 Kent Com. (12th ed.) 480, n. ; *Masterton* v. *Brooklyn*, 7 Hill, 62 ; *S. C.* 42 Am. Dec. 38.

Gomila & Co. used every possible effort to diminish the loss. They offered the cargo to the owners at the same price at which they had sold to Forestier & Co., but the owners refused it. Owners would do nothing at all. Gomila & Co. then cabled to England and France for quotations and offers, and the replies were all at so low a figure, and the risk of rapid deterioration of the cargo under the influence of a southern July sun was so great, that it was deemed best to sell at auction. The owners were so advised, public notice was given for several days in the daily newspapers of New Orleans, and the sale publicly made in the usual manner by a regular and licensed auctioneer, to the highest and last bidder.

Such a sale has the sanction and approval of the authorities. *Sands* v. *Taylor*, 5 Johns. 395 ; *S. C.* 4 Am. Dec. 374 ; *Girard* v. *Taggart*, 5 S. & R. 19 ; *S. C.* 9 Am. Dec. 327 ; *Mertens* v. *Adcock*, 4 Esp. 251 ; *Greenwood* v. *Cooper*, 10 La. Ann. 796 ; *Henderson* v. *Maid of Orleans*, 12 La. Ann. 352 ; *Pollen* v. *LeRoy*, 30 N. Y. 549 ; *Spraiger* v. *Berry*, 47 Maine, 330 ; *MacLean* v. *Dunn*, 4 Bing. 722.

Gomila & Co. might have loaded the vessel after the breach of the warranty and sent the cargo forward without thereby waiving their claim for damages. *Phillips* v. *Seymour*, 91 U. S. 646.

The sale of the cargo with privilege of the charter, therefore, could not release the damages which had occurred. It merely fixed the amount of the loss. *Sands* v. *Taylor*, 5 Johns. 410 ; *MacLean* v. *Dunn*, 4 Bing. 722.

The measure of damages was correctly arrived at. The chief damage was the direct consequence of the loss of the sale to Forestier & Co. The price of the sale to them was fixed by the contract. The price obtained at the auction sale was the only evidence of the value at that time. The respondents' agents were notified of the sale and suggested no better mode of fixing the measure of damages.

Neither does it appear that any objection was made in the court below to the mode adopted by the court for fixing the measure of damages, or to the amount found, or that any finding upon this point was requested by respondents.

The only reference thereto is in their bill of exceptions where their objection is that the finding, fixing the damages, is a conclusion of law and therefore inoperative as a finding of fact. Their failure to make other objections to the finding, or to ask the court to find otherwise, indicates that they were then satisfied with the finding, and was a waiver of any other finding upon this subject. *The Osborne*, 104 U. S. 183; *Lumber Co.* v. *Buchtel*, 101 U. S. 633.

The finding thus became equivalent to a general verdict assessing the damages, and cannot be reviewed here. *Insurance Co.* v. *Folsom*, 18 Wall. 237; *The Benefactor*, 102 U. S. 214.

VI. Forestier & Co. had a right to refuse acceptance of the incomplete cargo. The conditions of their purchase were the delivery on board of seller's vessel of *not less* than 10,000 quarters during the month of June, *not later* than the 30th, midnight. These were the conditions precedent, the non-fulfilment of which frustrated the object of the contract. *Lowber* v. *Bangs*, 2 Wall. 728; *Behn* v. *Burness*, 3 B. & S. 751; *Deshon* v. *Fosdick*, 1 Woods, 286; *Glaholm* v. *Hays*, 2 Mann. & Gr. 257. The contract for 10,000 quarters was an entire one, and Forestier & Co. were not bound to accept any less quantity. *Reuter* v. *Sala*, 4 C. P. 239.

VII. In this discussion we have dealt with the facts as found by the court, assuming that this court will accept such findings as conclusive, and will consider only the law arising out of the fact, in accordance with the rule laid down in *The Abbotsford*, 98 U. S. 440, and followed in *The Benefactor*, 102 U. S. 214; *The Connemara*, 108 U. S. 352, and numerous other cases.

MR. JUSTICE BLATCHFORD, after stating the case as above reported, delivered the opinion of the court.

We are of opinion that the Circuit Court ought to have dismissed the libel, and that its decree must be reversed.

Negotiations for a charter of the vessel were opened in New Orleans, between De Wolf & Hammond and Gomila & Co., on the 16th of June, two days before the vessel arrived. Gomila & Co. then had a contract with Forestier & Co., made on the 7th of June, whereby the former sold to the latter a cargo of not less than 10,000 quarters and not more than 12,000 quarters, of 480 pounds each, of corn, at 60 cents per bushel of 56 pounds, " on board seller's vessel, with freight at (6s.) six shillings per quarter, and to be shipped from New Orleans during the month of June, not later than the 30th. (midnight), (seller's option)." In such negotiations with De Wolf & Hammond, Gomila & Co. insisted on a guarantee by the owners of the vessel that she should carry 10,000 quarters of 480 pounds each. Thereupon, on the 16th of June, a cable dispatch was sent by De Wolf & Hammond to Mr. Hammond of that firm, who was then in Europe and in communication with the respondents there, stating the terms of the offer which Gomila & Co. had made to charter the vessel, but that she must be guaranteed to carry not less than 10,000 quarters, and that it was proposed that the charterers should have the power of cancelling the charter-party if the vessel was not ready to load cargo by the 25th of June. To this dispatch Mr. Hammond replied, on the 18th of June, agreeing to the terms, and directing that the guarantee of the carriage of the 10,000 quarters should be made provided the captain should agree to the quantity, but saying nothing as to the cancelling clause. In view of these dispatches and of the previous negotiations, Mr. De Wolf, of De Wolf & Hammond, and the master of the vessel, and Mr. Gomila, of Gomila & Co., had a consultation, on the 18th of June, as to whether the vessel could carry 10,000 quarters of corn. At this consultation, Gomila and the master, both of them, reached the conclusion that the vessel would be able to carry 10,000 quarters, and Gomila advised the master to so cable the owners. This would be a reply to Mr. Hammond's cable dispatch of June 18th, in regard to the captain's agreeing to the quantity. A cable message was then made up by the master and De Wolf, from Gomila's code-book, in which the master said, " the vessel will carry 10,000 quarters of

grain, if we coal at Halifax." That message does not appear to have been sent, but, after it was prepared, Gomila "gave as his reasons for insisting on a guarantee," that is, a guarantee that the vessel should carry not less than 10,000 quarters, "the aforesaid contract with Forestier & Co., which was produced and read, and Gomila stated that he had no use for any vessel that would not carry 10,000 quarters of grain ; that he must have a guarantee, and feared that if the vessel would not carry that amount the consequences would be serious ; that the market had declined and was still declining, and the loss would be very heavy, because the buyer would have the right to reject the cargo if the conditions were not strictly fulfilled."

It is not found as a fact, that Gomila, in these negotiations and consultations, insisted upon any other guarantee than the one that the vessel should carry not less than 10,000 quarters of grain, of 480 pounds. Although he produced and read his contract with Forestier & Co.; he did not insist that there should be a provision or a guarantee in the charter-party that the cargo "should be shipped from New Orleans during the month of June, not later than the 30th (midnight) ;" nor did he insist upon any undertaking or guarantee in the charter-party that the vessel should commence her loading of the grain at any particular time, or should finish it at any particular time, or that she should coal at any particular place, or that there should be any cancelling clause in the charter-party.

On the 18th of June De Wolf & Hammond sent to Hammond, at Liverpool, a cable message stating that it was the opinion of the captain of the vessel that she could carry 10,000 quarters, coaling at Sydney, and that they had closed the charter-party according to the terms which it contains, stating those terms, (but not excluding Rouen,) subject to the owner's approval. To that message De Wolf & Hammond received, on the 19th of June, from Hammond an answer accepting on behalf of the respondents the offer, excluding Rouen, and the charter-party was then entered into, on the 19th of June.

It contains a provision that the "steamer is guaranteed to carry not less than ten thousand quarters, of 480 lbs." It con-

tains no provision as to the time when the loading of the grain shall commence, or when it shall be completed, or when the grain shall be shipped. It contains a provision that the vessel shall "have liberty to call at any ports for coal or other supplies;" and one (Article 13) that sixteen running days, Sundays excepted, are to be allowed the charterers, if the steamer shall not be sooner dispatched, for loading and discharging, and ten days on demurrage, over and above the said lay days, at six pence sterling per gross register ton per day. The net register tonnage was stated in the charter-party to be 1090, or thereabouts. The blank in Article 14, that the charterers should have the option of cancelling the charter if the vessel should not be ready to load at New Orleans on or before a specified day, was not filled in, and no cancelling provision was inserted. By Article 15, the lay days were to commence the day after the steamer was declared ready to receive cargo, and had been passed by the surveyor of grain vessels, and written notice had been given by the master to the charterers, that is, written notice of the readiness of the vessel to receive cargo, and of her having been passed by the surveyor of grain vessels.

It is stated, in the fifth finding of facts, that the cancelling date of the charter-party, that is, some date to be filled into the blank left in Article 14, "was not fixed, because Gomila & Co. waived it, as the ship was in port and they had confidence in the ability and willingness of the master to get the ship ready in time." Gomila & Co., by waiving the insertion of such date, abandoned all claim to insist upon the right to cancel the charter-party if the vessel should not be ready to load by a day specified, so as to enable them to comply with the requirement in their contract with Forestier & Co., as to the time named in that contract for the shipment of the grain. Although the contract with Forestier & Co. was produced and read in the consultation and negotiation had before the charter-party was signed, no day for the readiness of the vessel to load was specified in the charter-party, and the waiver of the cancelling date, by Gomila & Co., was made in full view of the fact, that the terms of the contract with Forestier & Co.

were known to De Wolf & Hammond and the master of the vessel, as well as to Gomila & Co.

On the 28th of June, the loading of the vessel was commenced, with the consent of all concerned, although, as the findings state, no formal tender appears to have been made of the vessel on that day. Article 15 of the charter-party states that the sixteen running lay days are to commence after written notice is given by the master to the charterers, of the readiness of the vessel to receive cargo. It is not found that such notice was given. The loading was continued until 20 minutes past 3 o'clock on the 30th of June, when it was stopped, and the vessel was declared by the inspector for the underwriters to be full all over, and ready to proceed on her voyage, and he gave his certificate to that effect. The findings state that she then had only 9635 quarters on board, equivalent to $82,588\frac{2}{56}$ bushels, "and could take no more with safety, as she was then loaded and stowed, although libellants had the balance of the cargo of 10,000 quarters in barges alongside, and it could have been put on board before midnight if the ship could have taken it." After the loading had begun, and before it was known whether the vessel could take the 10,000 quarters, all parties supposing that she could, Gomila & Co., as was usual in such cases, handed their copy of the charter-party to Forestier & Co. The latter, without authority from Gomila & Co., took such copy to De Wolf & Hammond, unindorsed, and obtained a charter-party in their own name, but otherwise the same in all respects as the charter-party to Gomila & Co., for the purpose, as Forestier & Co. explained, of appearing to their correspondents in Europe to be the original parties to the charter-party. Gomila & Co. were advised of this by De Wolf, of De Wolf & Hammond, before the loading was finished, on June 30th, but replied to him that they would not object to such a change if the vessel fulfilled the guarantee in the charter-party, but that if she failed to do so they would expect the return of the paper. On this point the Circuit Court expressly finds "that Gomila & Co. did not authorize the surrender of their charter and the giving of a new one to Forestier & Co., save upon the condi-

tion that the Deronda should first execute her guarantee." Therefore, Gomila & Co. not only retained the ownership of the corn which they had laden on the vessel, but they held the respondents to a compliance with the charter, by not giving notice to De Wolf & Hammond that they, the charterers, considered the charter-party at an end by reason of the fact that, as the vessel was then loaded and stowed, she could take with safety no more than the 9635 quarters, then on board.

It is stated in the findings that "when, on the 20th of June, the steamer was loaded, as described in the sixth finding, all parties had notice at once that the steamer could not carry the quantity guaranteed." What the word "notice" in this statement means is not entirely clear. It is not stated that De Wolf & Hammond, as agents of the vessel, gave any notice to the libellants that the vessel could not and would not carry the 10,000 quarters, nor is it found that Gomila & Co., thereafter gave any notice to the respondents, or to the agents of the vessel, that they would consider the charter-party cancelled. On the contrary, under the direction of Gomila, acting through Forestier & Co., negotiations were opened to arrange the matter with the respondents. As a part of the effort to do so, Forestier & Co., by cable, endeavored to induce their correspondents in Europe to take the 9635 quarters which had been loaded, but this was refused. As part of the negotiations, De Wolf & Hammond cabled to the respondents, on June 30th and July 3d, asking for advice, and received the answers of July 1st, and July 4th, before set out. It is found that it does not appear that the charterers at the time had any knowledge of the above-named dispatches. Still, both parties left the question open, and carried on negotiations with a view to a compromise, but without any result, until the 5th of July, on which day Forestier & Co. notified Gomila & Co. that they refused the cargo because it was short and their buyers in Copenhagen had declined to accept it. They claimed damages of Gomila & Co., for a violation of the contract of sale of June 7th, consisting in the loss of their commissions, amounting to $3194.29, which Gomila & Co. paid to them. From July 3d to July 5th, Gomila & Co., as owning the corn

laden on board of the vessel, telegraphed to some of the best known dealers in England and France for quotations and offers. This manifestly was under the view that the 9635 quarters were to be carried by the vessel, and under the charter-party. But the best offer was a sum which they were unwilling to accept, and they then notified De Wolf & Hammond that they would sell the cargo on board of the vessel, at the shipper's risk, in the port of New Orleans, with the privilege of the charter. They thus still adhered to the charter as a subsisting charter with themselves. But, before they sold the cargo, and on the 6th of July, De Wolf & Hammond notified them (Gomila & Co.) that they (De Wolf & Hammond) would take out coal and make room for the balance of the cargo, and that the vessel would be made ready by the 7th of July. Gomila & Co. refused this proposal, and sold the cargo on the 7th of July. They did this wrongfully. Negotiations in regard to the matter had continued from and including the 30th of June, when the loading of the 9635 quarters had been completed, to and including the 5th of July, not only with the assent of Gomila & Co., but with their active co-operation. By the 6th of July, De Wolf & Hammond had satisfied themselves that by a rearrangement of the stowage and by taking out some of the coal and water, room could be made for more cargo, sufficient to make up the 10,000 quarters. Under the circumstances, and in view of the facts before stated, that there was no day specified in the charter-party for the commencement or completion of the loading, and no cancelling date named in the charter-party, there was no unreasonable delay in the action of the respondents or their agents. Notwithstanding this offer on the part of the vessel, Gomila & Co., on the 7th of July, sold the 9635 quarters on board of the vessel at public auction, with privilege of the charter, to A. Carrière & Sons, for $29,622.84, which was not quite 36 cents per bushel. The corn afterwards came into the hands of Forestier & Co., by a repurchase, at the price of $40,422.00, which was at the rate of not quite 49 cents per bushel.

On the 13th of July, the stowage of the vessel having been in the meantime rearranged, and a large quantity of coal and

water, the latter from the ballast tanks, having been taken out, she was again tendered to Gomila & Co., and to Forestier & Co., and the balance of the cargo was demanded. This was furnished by J. B. Camors & Co., and enough more corn was taken on board to make over 10,000 quarters, with which the vessel sailed on the 18th of July for her original destination. She arrived safely and delivered her cargo.

Upon the foregoing facts we are unable to concur in the conclusions of law arrived at by the Circuit Court. The vessel did carry 10,000 quarters of corn, of 480 pounds. With the exception of 365 quarters, or 3126 bushels, out of 10,000 quarters, or 85,708 bushels, this corn was the identical corn laden on board of the vessel by Gomila & Co. The only stipulation in the charter-party with Gomila & Co. which they insisted upon having inserted was, therefore, complied with, and complied with in a reasonable time, as we have seen, in the absence of all provisions in the charter-party with Gomila & Co. that the vessel should commence loading by a certain day, or complete loading by a certain day, or that the cargo should be shipped from New Orleans by a certain day ; and in the absence of any written notice from the master to the libellants, as provided in the charter-party, as to the readiness of the vessel to receive cargo, in order to set running the lay days for loading; and in the absence of any notice by the libellants to De Wolf & Hammond that they considered the charter-party at an end because of a breach of the guarantee that the vessel should carry not less than 10,000 quarters, of 480 pounds, prior to the giving of the notice by De Wolf & Hammond to Gomila & Co., on the 6th of July, that room would be made for the balance of the 10,000 quarters, or prior to the sale of the cargo at auction by Gomila & Co., on the 7th of July. Not before such sale on that day, with privilege of the charter, did Gomila & Co. terminate their interest under the charter ; and by such action, under the circumstances, they failed to keep the charter-party on their part, while the respondents had not at that time failed to perform it on their part, and afterwards went on and performed it. If Gomila & Co. had not made the auction sale, of the 7th of July, they might themselves, as clearly appears,

have afterwards furnished the 365 quarters, and obtained all they were entitled to under their charter-party. If they lost anything by reason of their failure to carry out their contract with Forestier & Co., it was not the fault of the respondents in failing to observe any stipulation on their part in the charter-party with Gomila & Co., but it was due to the fact that Gomila & Co., accepted a charter-party which did not contain such provisions as to time and as to cancellation as would have enabled them to hold the respondents to the same terms, as to the time of shipping the cargo, which were provided for in the contract between Gomila & Co. and Forestier & Co. Those provisions were industriously left out of the charter-party after both of the parties who were to make it had had their attention called to the terms of the contract of sale between Gomila & Co. and Forestier & Co. That being so, Gomila & Co. cannot have the same benefit as if those provisions had been inserted. The court is bound to give effect to the stipulations of the contract, but not to provisions which the parties deliberately omitted to insert, after attention had been directed to them. This ruling is in harmony with the views laid down in *Norrington* v. *Wright*, 115 U. S. 188, and in *Filley* v. *Pope*, 115 U. S. 213.

> *In accordance with these views, the decree of the Circuit Court is reversed, and the case is remanded to that court with a direction to enter a decree dismissing the libel, with costs to the respondents in the District Court and in the Circuit Court.*