## THE ROSEMARY.

### TALGE MAHOGANY CO. v. NICKLAS et al.

(Circuit Court of Appeals, Fifth Circuit. January 3, 1922.)

No. 3660.

1. Shipping ⬤➾43—Owner not bound by representation of broker as to time for loading, not contained in charter.

Where a charter party contained no express provision as to the time the vessel was to be at the loading port, and the owner of the vessel, prior to the making of the charter party, was not informed of a telegram sent by a broker stating such time, and the broker was without authority to bind the owner, the charter party was the sole evidence of the obligations incurred by the owner.

2. Shipping ⬤➾43—Owner's obligation to charterer complied with, if vessel at loading port without unreasonable delay.

Where the parties to a charter party, covering a voyage from Secondee or Axim, Africa, contemplated that, before entering on such service, the vessel was to carry a cargo from Gulfport, Miss., to Durban, Africa, and no definite time was fixed for its arrival at Secondee or Axim the shipowner's obligation was complied with if there was no delay which was unreasonable under the circumstances.

3. Shipping ⬤➾43—Vessel not guilty of unreasonable delay in arriving at loading port.

A vessel, which, after unloading at Durban, on the east coast of Africa, was under charter for a voyage from Secondee or Axim, on the west coast, *held* not to have unreasonably delayed its arrival at the loading point by going to Delagoa Bay for a cargo of coal and carrying it to Lobita, and there taking on a cargo to be carried to St. Thome, where it was customary and safer for vessels to go from the east to the west coast with cargo instead of in ballast, and enabled them to make better time, and it would have taken a longer time to get sufficient ballast at Durban than was consumed in going to Delagoa Bay, especially where the charterer was not ready to specify the loading point until the vessel left Lobita.

**4. Admiralty ⬩⟍66—Libelant not estopped by claim for dead freight to amend to claim greater amount.**

An owner filing a libel against a cargo of logs for dead freight because of misinformation from the charterer as to the weight of the cargo, was not thereby estopped from amending to claim dead freight on a greater tonnage, where the charterer had not changed its condition in any way in reliance on the first claim, and the shipowner thereby obtained no advantage.

**5. Shipping ⬩⟍52—Charterer, failing to furnish full cargo, held liable for "dead freight."**

A charterer, who agreed to provide and furnish a vessel a full and complete cargo of mahogany logs under and on deck, but who failed to furnish sufficient logs to fill the hold and deck space available for carrying logs, though a full cargo was demanded by the master, was liable for "dead freight," which is the compensation due when the charterer fails to ship the full amount of cargo stipulated for.

[Ed. Note.—For other definitions, see Words and Phrases, Dead Freight.]

**6. Shipping ⬩⟍52—Charterer exceeding schedule time to load not entitled to credit for time saved by not loading full cargo.**

Where a charter party allowed the charterers 15 days for loading, but, without any fault on the part of the vessel or its owner, 25 days were consumed in delivering and loading the logs furnished, which did not constitute a full cargo, the charterer was not entitled to credit on the dead freight for the time saved by the vessel in consequence of a full and complete cargo not being furnished.

Appeal from the District Court of the United States for the Southern District of Mississippi; Edwin R. Holmes, Judge.

Libel by Charles Nicklas, master of the American schooner Rosemary, against the Talge Mahogany Company, with libel by the Talge Mahogany Company against the schooner Rosemary and others. From an adverse judgment, the Talge Mahogany Company appeals. Affirmed.

Edwin T. Merrick, Ralph J. Schwarz, and William J. Guste, all of New Orleans, La., for appellant.

W. A. White and Hanun Gardner, both of Gulfport, Miss. (White & Ford, of Gulfport, Miss., on the brief), for appellees.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. On February 19, 1919, the appellee, Charles Nicklas, master and agent of the American schooner Rosemary, filed a libel against the appellant, Talge Mahogany Company, and 324 mahogany logs, claiming $14,080 for dead freight on 320 tons at the rate stated in the charter of the vessel, $44 per ton, the amount of two days' demurrage, and the amount of an insurance premium paid on freight by the libelant. That libel was amended, as hereinafter stated. On February 21, 1919, the appellant, Talge Mahogany Company, filed its libel against the Rosemary, claiming damages which were attributed to the failure of the vessel to arrive at the port of loading selected by the appellant until several months after the date indicated in a telegram, sent by J. W. Somerville to the ap-

pellant prior to the making of the charter party, which contained the statement, "Vessel should make about June nineteen eighteen loading."

Pursuant to an agreement of the parties, the two cases were consolidated, after the libeled logs had been released with the consent of the appellee. The court rendered a decree dismissing the appellant's libel, disallowing the appellee's claims for demurrage and insurance premium on freight, and awarding the appellee $22,478.95, that sum being the amount of dead freight on 487 tons of mahogany logs at $44 per ton, less the ascertained cost of loading and unloading that amount of mahogany logs, with interest from the date of the completion of the discharge at Gulfport of the Rosemary's cargo. The appellant complains of the dismissal of its libel, and of the amount awarded against it on the appellee's libel, claiming that the award of that amount was not warranted by the pleadings or the evidence.

By the charter party, which was made at Gulfport, Miss., and was dated December 4, 1917, the owner of the Rosemary agreed "on the freighting and chartering of the whole of said vessel (with the exception of the cabin, and necessary room for the crew and storage of provisions,. sails, and cables), or sufficient room for the cargo hereinafter mentioned, unto" the appellant "for a voyage from the port of Secondee or Axim, Africa, to Mobile or Gulfport, one port only for loading and chartering, at charterer's option. Orders for loading port to be given when asked for by owners or master." The instrument referred to the Rosemary as "now Mobile, due here Saturday 8th to load for Durban, South Africa," and contained the provision that the charterer "doth engage to provide and furnish said vessel a full and complete cargo of mahogany logs under and on deck, no log to weigh over three (3) tons."

The making of the charter party was the result of telegraphic negotiations between J. W. Somerville, a shipbroker at Gulfport, and the appellant, whose place of business is Indianapolis. The beginning of that correspondence was a telegram from Somerville to the appellant, dated November 23, 1917, and stating:

"Understand you are in the market for tonnage west coast Africa to Gulf with mahogany can probably close with prompt advice new schooner Rosemary capacity about fifteen hundred to sixteen hundred tons dead weight now about to load for South Africa. Wire if interested."

Appellant replied by a telegram of the same date, stating:

"Will consider firm offer Secondee or Axim to Gulfport. State approximate arrival date."

Somerville replied by a telegram of the same date containing the following:

"Vessel should make about June nineteen eighteen loading."

[1] The charter party contained no express provision on the subject of the time when the vessel was to be at the one of the two mentioned loading ports to be chosen by the charterer. The owner of the Rosemary was not, prior to the making of the charter party, informed of the above-mentioned telegrams. Somerville was without authority to

bind the shipowner by a statement as to the time when the vessel should be at the proposed place of loading. The charter party was the sole evidence of the obligations incurred by the owner of the Rosemary. The Addison E. Bullard, 258 Fed. 180, 169 C. C. A. 248.

[2] The terms of the charter party show that it was contemplated by the parties that the vessel, which was chartered to carry a cargo of mahogany logs from Secondee or Axim, Africa, to Mobile or Gulfport, was, before entering upon that service, to carry a cargo from Gulfport to Durban, Africa. As the charter party fixed no definite time for the vessel to be at Secondee or Axim ready to receive the cargo, the shipowner's obligation in that regard was complied with if there was no delay which was unreasonable under the circumstances. Culliford v. Gomila, 128 U. S. 135, 9 Sup. Ct. 50, 32 L. Ed. 381; Lovell v. Davis, 101 U. S. 541, 25 L. Ed. 944.

[3] There was no evidence furnishing any support for a claim that there was any lack of diligence in making the voyage to Durban, which is on the east coast of Africa. The vessel arrived at Durban on June 2, 1918, and finished discharging its cargo about June 18th. The claim is made that there was unreasonable delay as a result of the use made of the vessel after it reached Durban, in that it went to Delagoa Bay, 270 miles north of Durban, for a cargo of coal. which it carried to Lobita, there took on another cargo, which it carried to St. Thome, and went from St. Thome to Secondee; Lobita and St. Thome being places on the west coast of Africa in the route the vessel would have taken in a voyage from Durban to Secondee or Axim. The evidence adduced was such as to support findings to the following effect:

The Rosemary, a sailing vessel, had to have ballast or a cargo to make the voyage from Durban around the Cape of Good Hope to the west coast of Africa. Under the circumstances which existed, it did not lose time by going to Delagoa Bay, there getting a cargo of coal and going loaded to Lobita, and there taking on a cargo to be carried to St. Thome. The vessel could not get a cargo at Durban for a point between that place and Secondee or Axim, which are on the west coast of Africa, about 42 miles apart. It would have taken it a longer time to get sufficient ballast delivered and loaded at Durban than was consumed in going to Delagoa Bay, taking on the cargo of coal, and getting back to a point off the coast opposite Durban. By going loaded with cargo, instead of going light with ballast, in a voyage around the Cape, such as the Rosemary made, a sailing vessel can make the voyage in much less time, as it can keep close to shore when loaded with cargo, and by doing so is enabled to take advantage of favorable currents and winds and to save more than 1,000 miles in distance. It is customary for vessels going around the Cape from the east to the west coast of Africa to go with cargo, instead of in ballast. It is safer to follow that custom, and by doing so the vessel makes better time.

Though the appellant was informed several times of the movements of the Rosemary after it left Delagoa Bay, and on August 8 and September 6, 1918, was asked for instructions as to the place, Secon-

dee or Axim, at which the vessel was to be loaded, it gave no such instructions until September 8th, the day the vessel left Lobita for St. Thome. Appellant's conduct during the time mentioned did not indicate that it then understood or claimed that there was any undue delay in the progress of the vessel, or that the appellant was ready to name the loading port any considerable time before the selection actually was made and notice thereof given. There is nothing in the charter party to indicate that it was contemplated by the parties that the vessel, after discharging its cargo at Durban, was to make the long voyage of more than 3,000 miles from that port to Secondee or Axim without a cargo. We conclude that the evidence did not show that the arrival of the Rosemary at Secondee was unreasonably delayed, and that the court did not err in dismissing the appellant's libel.

[4] The appellee's libel was amended by making its claim for dead freight one on 750 tons at the charter rate, amounting to $30,800, instead of on 320 tons, as claimed in the original libel. It was disclosed that the original libel was filed before the cargo was discharged and weighed at Gulfport, that the claim it made as to dead freight was based on information given by the appellant's agent at Secondee to the effect that the cargo weighed about 1,100 tons, and that when the cargo was weighed after it was unloaded its weight was found to be, only 707 tons. The claim for dead freight, as made in both the original and the amended libels, was based on the difference between 1,450 tons, the alleged log-carrying capacity of the vessel, and the number of tons in the cargo; the difference between the two pleadings being in their respective allegations as to the weight of the cargo actually carried and the additional tonnage required to make a full and complete cargo. It has not been claimed that the court was in error in allowing the amendment to be made.

The contention urged is that the appellee, by claiming that he was entitled to the amount of dead freight on 320 tons, estopped himself from thereafter claiming in the same suit that he was entitled to dead freight on a much larger tonnage. The elements necessary to an estoppel are lacking. There is nothing to indicate that, between the date of the filing of the libel and the date of its amendment, the appellant changed its condition in any way in reliance on the appellee claiming dead freight on only 320 tons. The amendment was allowed before the appellee had successfully maintained any claim to dead freight. The appellee got no advantage by claiming less than he was entitled to in consequence of his being misinformed by the appellant as to the weight of the cargo. When the amendment was made, nothing had occurred which stood in the way of the appellee recovering more for dead freight than was claimed in the original libel.

[5] It is not controverted that the evidence showed that the appellant failed to comply with its undertaking "to provide and furnish said vessel a full and complete cargo of mahogany logs under and on deck, no log to weigh over three (3) tons." The appellant's noncompliance with that undertaking entitled the appellee to recover for dead freight, which is the compensation due when the charterer fails

to ship the full amount of cargo stipulated for, unless in some way the appellee has been barred from enforcing that claim. There was evidence to support findings that the logs delivered to the vessel, some of them weighing considerably more than 3 tons, were substantially less than enough to fill the vessel's hold and its deck space which was available for carrying logs, and that the vessel could have carried safely and conveniently, in its hold and on deck, 487 tons of mahogany logs in addition to the cargo it received. The vessel's master demanded of the appellant's agent at Secondee that more logs or other cargo be furnished, which demand was not complied with. That the making of a claim for dead freight was in contemplation before the vessel left Secondee is indicated by the circumstance that the bill of lading there given for the logs shipped, and, without protest, accepted by the appellant's agent at that place, contained the following: "Freight and dead freight to be calculated on the official weight at Gulfport." There is nothing in the record which requires the conclusion that the court was not warranted in basing its award for dead freight on the above-mentioned phase of the evidence as to the number of tons of logs, in addition to what was shipped, required to make the "full and complete cargo of mahogany logs under and on deck" which the charter party obligated the appellant to provide and furnish.

[6] It was contended in argument that the court, in fixing the amount of its award for dead freight, should have allowed a credit for the time saved by the vessel in consequence of its not receiving the quantity of logs required to make the full and complete cargo called for by the charter party. That instrument contained the provision: "There is to be allowed charterers for loading fifteen (15) running days, Sundays and holidays excepted." Twenty-five working days were consumed in delivering and loading the logs furnished, the delivery and loading not being done continuously. Evidence adduced warranted the finding that the failure to complete the loading in the 15 days allowed by the charter party was not due to any fault chargeable against the vessel and its owner. As it was not made to appear that the charterer's failure to ship the amount of cargo stipulated for enabled the vessel to start on its voyage from Secondee sooner than it would have done, if the stipulations in that regard had been complied with, the above-mentioned claim that the vessel got the benefit of a saving of time to which it was not entitled is not well founded.

In our opinion the record does not show any reversible error.

The decree is affirmed.